**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>ROBERT BARROW,<br><br>                    Defendant. | Case No. 2:13–cr–185–MDD–VCF<br><br>**REPORT & RECOMMENDATION**<br><br>MOTION TO SUPPRESS (#140) |

This matter involves the United States' prosecution of Robert Barrow. Before the court is Mr. Barrow's motion to suppress (#140). The government opposed (#147) and Mr. Barrow replied (#152). For the reasons stated below, the motion should be denied.

**I. BACKGROUND**

Two armed robberies were reported early in the morning of April 27, 2013. The first occurred at a Rebel Gas Station on West Sahara Avenue at 4:52 am. The robber brandished a chrome handgun and demanded money from the attendant, who complied and emptied the cash register's cash and coin drawers into a trash can. The robber took the money, two cartons of cigarettes, and departed in a maroon four-door Saturn. Unbeknownst to the robber, the stolen money contained a tracking device.

The second robbery occurred at a Rebel Gas Station on East Warm Springs at 6:00 am. The robber brandished a handgun, demanded money from two people, and departed with the stolen money in a maroon four-door Saturn.

Between 6:33 am and 6:56 am, the Las Vegas Metropolitan Police Department received five signals from the money-tracking device. The signal indicated that the stolen money was in the area of

South El Capitan Way and West Flamingo Road. Officers responded and noticed a maroon Saturn a few blocks away, between West Rochelle Avenue and West Flamingo Road.

When the officers began to follow the maroon Saturn, it accelerated, turned into a housing complex, and drove through a closed security gate. The officers activated their lights and sirens and pursued the Saturn as it drove through a second security gate, and eventually turned into the Rancho De Montana apartment complex. It drove through a third security gate in the process.

Two witnesses heard the crash and called 911. It was approximately 7:01 am. They reported that they saw a white man in his mid-30s with curly brown hair who was wearing glasses, an Aloha shirt, and khaki shorts. He dropped something into some nearby bushes, noticed that he had been seen, and immediately retrieved whatever he had discarded.

The Saturn was unoccupied when the officers reached it. They discovered that it had been stolen earlier in the day. A search warrant was obtained and a black Baikal .380 semi-automatic handgun was recovered. It was loaded with Tulammo ammunition.

Meanwhile, Officers Farran and Hopson noticed a white male who appeared to match the description of the driver of the Saturn. He was walking down West Flamingo Road and entered a 7-11 convenience store. The officers decided to investigate. They entered the 7-11 and saw Robert Barrow sitting at a slot machine. He appeared dusty and dirty. He was sweating and bleeding from the top of his hand.

Officers Farran and Hopson interviewed Mr. Barrow. He told the officers that he did not live in the area and was visiting a female who lives nearby. When asked if the officers could contact the woman to verify his story, he said, "that's not going to happen." An officer noticed that Mr. Barrow hand was bleeding and asked how he had cut it; he said he cut it on gate while exiting an apartment complex. They also asked him how he got to West Flamingo Road. Mr. Barrow said that he drove over the night before.

His car broke down near West Oakey Boulevard and South Durango Drive and the woman picked him up.

Mr. Barrow was then asked to come outside where he was patted down and briefly handcuffed. One of the witnesses was brought to identify him. Meanwhile, the officer checked Mr. Barrow's criminal history. At approximately 8:05 am, one of the officers informed Mr. Barrow that "it was a case of mistaken identity." Mr. Barrow was released and entered a red four-door vehicle, driven my Robert Barr.

Soon thereafter, Officer Hopson learned that a robbery detective had placed a "24/7 contact notification" in Mr. Barrow's record. Officer Hopson contacted the robbery detective, who instructed the officer to detain Mr. Barrow.

Officer Hopson followed Mr. Barr's car, noticed that it had an obstructed view, and conducted a traffic stop at West Sahara Avenue and South Tenaya Way. Mr. Barrow was arrested and transported to the Las Vegas Metropolitan Police Department's robbery office.

A detective immediately reviewed evidence obtained from the two armed robberies. He watched surveillance footage of the robberies and determined that Mr. Barrow's build and clothing matched the build and clothing of the robber. He also determined that the black Baikal .380 semi-automatic handgun matched the handgun in the surveillance footage. Mr. Barrow was subsequently arrested for robbery.

Later that day, Mr. Barrow called Mr. Barr while Mr. Barrow was detained at the Clark County Detention Center. An automated message notified Mr. Barrow that his call may be recorded. During the call, Mr. Barrow asked Mr. Barr to retrieve a jacket and backpack from an Oldsmobile located at 1608 Estrella Street.

The next day, on April 28, 2013, Mr. Barrow called his daughter from the Clark County Detention Center. They discussed his initial encounter with the police officers and stated that he had cut his hand on a gate at an apartment complex while visiting a woman.

3

Meanwhile, the police went to Estrella Street, discovered a red Oldsmobile registered to Mr. Barrow, and saw a backpack and heap of clothing in plain view in the backseat. The vehicle was impounded and a search warrant was obtained.

On April 29, 2013, Mr. Barrow made a second call to Mr. Barr from the Clark County Detention Center. He asked if he had retrieved the backpack and jacket from the car. Mr. Barr responding, saying "it's gone." Mr. Barrow replied, calling Mr. Barr "the bomb!" Mr. Barrow had misunderstood Mr. Barr. The car was gone, "they got it," he said. "Motherfuckers," Mr. Barrow replied.

The police subsequently executed the search warrant on Mr. Barrow's red Oldsmobile and discovered a brown jacket, which resembled the jacket the robber had been wearing in the surveillance footage. A box of .380 Tulammo ammunition was also found in car.

## II. DISCUSSION

Mr. Barrow now moves to suppress. His primary argument is that the stop at the 7-11 violated the Fourth Amendment. The court disagrees. The touchstone of the Fourth Amendment is objective reasonableness under the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Each of the officers' actions taken at the 7-11 were objectively reasonable under the circumstances.

It is well settled that a police officer may stop and interview a person if the officer reasonably suspect that the person "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The police officer may conduct a weapons pat down, *see Terry v. Ohio*, 392 U.S. 1, 30 (1968), and "a ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Bekemer v. McCarty*, 468 U.S. 420, 439 (1984). The duration and scope of the officer's intrusion must be proportionate to the suspected offense. *United States v. Grigg*, 498 F.3d 1070, 1080–81 (2007).

The stop outside the 7-11 was reasonable. A suspect of two armed robberies had crashed through three security gates and abandoned a car containing a semiautomatic handgun. Two witnesses provided a description of the person, which generally matched Mr. Barrow's appearance. As a result, the police entered the 7-11, interviewed Mr. Barrow, and asked him to go outside where he was patted down, briefly handcuffed, and viewed by an eyewitness.

These intrusions were proportionate to the suspected offense of armed robbery, *see Grigg*, 498 F.3d at 1080–81, and reasonably limited in scope to confirm or dispel the officers' suspensions. *McCarty*, 468 U.S. at 439. Additionally, there is no question that the officers' stop was supported by reasonable suspicion. *See United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (citation omitted) ("Reasonable suspicion is defined as a particularized and objective basis for suspecting the particular person stopped of criminal activity."); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (defining reasonable suspicion as "some minimal level of objective justification," something more than a "hunch"). Mr. Barrow was in the same area as the suspect; he wore generally the same attire; and was he bleeding. These facts provide an objective basis to suspect that Mr. Barrow may have been the driver of the abandoned car. Therefore, Mr. Barrow's motion to suppress should be denied.

Mr. Barrow also requests a *Franks* hearing to challenge the probable-cause finding underlying the search warrant that was obtained for the Oldsmobile. Mr. Barrow's request fails as a matter of law. In *Franks v. Delaware*, 438 U.S 154 (1978), the Supreme Court established a two-prong test for overturning a judicial officer's probable cause finding. First, the there is a "presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 171. Second, a defendant is entitled to an evidentiary hearing on the validity of the affidavit only if he can make a "substantial showing" that: (1) the affidavit contains intentionally or recklessly false statements or misleading omissions and (2) the affidavit cannot

support a finding of probable cause without the false information or with the misleading omissions. *Id*. at 155–56.

The Ninth Circuit articulated five requirements that a defendant must satisfy to warrant a *Franks* hearing: (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statements must be necessary to find probable cause. *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (citing *United States v. Dicesare*, 765 F.2d 890, 895 (9th Cir. 1985)).

This means that a defendant must show that the affidavit could not support a finding of probable cause even if it were purged of its falsities and supplemented by the omissions. *See United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 171–72). A judge's probable cause determination is accorded "significant deference," *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995), and will be overturned only if it is "clearly erroneous." *Stanert*, 762 F.2d at 778. In making this determination, the court is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *Id*. The duty of a reviewing court is to ensure that the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 238 (internal quotations omitted).

Mr. Barrow failed to satisfy this standard. He complains that the search-warrant affidavit omitted the eleven facts. However, many of the facts that Mr. Barrow cites are irrelevant to the probable-cause inquiry—that is, whether there was "a fair probability that contraband or evidence of a crime will be found in" the Oldsmobile. *Illinois v. Gates*, 462 U .S. 213, 238–39 (1983). He asserts that the search-warrant affidavit failed to mention that: (1) Mr. Barrow was taken into "custody" when he was removed from the

7-11; (2) Mr. Barrow was patted down, handcuffed, and the contents of his pockets were emptied onto the hood of a patrol car; (3) the police officers radioed for a show-up identification; (4) the show-up identification was negative; (5) Mr. Barrow was subjected to a "custodial interrogation" outside the 7-11; (6) Mr. Barrow remained at the 7-11 for approximately 15 minutes after being released; (7) that Mr. Barr made an illegal U-turn in front of Officer Hopson; (8) Officer Hopson allegedly knew that Mr. Barrow had a 24/7 contact notification on his record before he was released; (9) Mr. Barrow and Mr. Barr got gas before being pulled over; (10) Mr. Barrow was not Mirandized; and (11) an unknown detective took Mr. Barrow keys for 40 minutes and then returned them. (Doc. #140 at 17–18).[1]

These facts either conjectural, irrelevant, or legal conclusions. They do not show that the probable-cause finding was "clearly erroneous." *Stanert*, 762 F.2d at 778. Nor does Mr. Barrow assert that the probable-cause finding was "clearly erroneous." He contends that "inconsistencies contained within the affidavit sat5 [*sic*] doubt on the assertion of probable cause." (Doc. #152 at 3:9). Mere "doubt" regarding "consistency" is the incorrect legal standard. *See id*.; *see also Gil*, 58 F.3d at 1418 (stating that a judge's probable cause determination is accorded "significant deference"). A defendant seeking a *Franks* hearing must make a "substantial showing" of "intentionally or recklessly false statements or misleading omissions." *Franks*, 438 U.S at 171.

There is no question that probable cause existed to search Mr. Borrow's car. Mr. Borrow got on the phone at the detention center, was notified that his call may be recorded, and then asked a friend to go remove items from his car. These statements alone create "a fair probability that contraband or evidence of a crime will be found in" the Oldsmobile. *Gates*, 462 U.S. at 238–39. Therefore, Mr. Barrow's request for a *Franks* hearing is denied.

---

[1] In reply, Mr. Barrow also contends that the search-warrant affidavit was flawed because it referenced 2009 robberies, which Mr. Barrow allegedly participated in.

Mr. Barrow's makes various other arguments in support of suppression. He asserts that his formal arrest violated the Fourth Amendment, *see* (Doc. #140 at 5:14–15), his *Miranda* rights were violated when he was interviewed in front of the 7-11, *see* (*id*. at 16:18–21), the he had a reasonable expectation of privacy in the stolen Saturn, and the government violated section 1983, (*id*. at 14:15–18) ("To support a [ 1983 [*sic*] claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the fmding [*sic*] of probable cause."). The court declines to address these arguments. They are cursory, conclusory, unrelated to the gravamen of Mr. Barrow's motion, and some were abandoned in reply. *See United States v. Balcar*, 141 F.3d 1180, 1180 (9th Cir. 1988) ("None of these conclusory arguments are discussed in any depth and we thus decline to address them.").

The court also declines to hold an evidentiary hearing on Mr. Barrow's motion. "An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (citing *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)). Mr. Barrow's motion failed to overcome this standard. The material facts supporting a finding of reasonable suspicion are undisputed. Mr. Barrow merely contends that the facts do not support a finding of reasonable suspicion under the prevailing law. For the reasons stated above, the court disagrees.

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that Robert Barrow's Motion to Suppress (#140) be DENIED.

/// /// ///

/// /// ///

/// /// ///

8

IT IS SO RECOMMENDED.

DATED this 22nd day of October, 2015.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE